In Dinell v. Pinheiro, 152870 Good morning. Good morning. May it please the court. In his deposition testimony, Raymond Tucker, who was at Brooklyn Central Booking on March 13, 2013, and who had been arrested for the first time for misdemeanor DUI, described his captivity as animal cruelty. Quote, If I were a dog, and that if the ASPCA was brought in and there was a dog in that cell, that the police officers, whoever were responsible for the treatment of that dog in that cell, that would be brought up on charges. And he made that statement for good reason, because he described the cell that he lived, that he spent hours in, as follows. There was urine, there was feces, there were bugs around the whole thing, and there was feces not only in it, but there was feces around it, on the floor, within the circumference, I'd say of close to six feet. Whether the feces were tracked away from other people, I don't know, but there was fecal matter in almost, I'd say, 35% of the jail cell, 30%. He also testified how, at the jail cell, he saw maggots in the fecal matter around the encrusted rim. Maggots do not just appear. Granted, it's not in the record, but if the court wants to do any independent research, it takes approximately 24 to 80 hours. It's like a gestation cycle for maggots. What Judge Kuntz's decision and the city's arguments carry to their logical extreme provide is that absent horrific conditions such as the hypothetical posed by this court in Willing, where somebody's being showered with excrement for 10 minutes, nobody held pre-arraignment, and that's a very important concept. We're not even talking post-arraignment, pre-trial custody, but someone who's just been arrested. You're taking on a more difficult burden than you need to. How so, Judge? Because if I understand correctly the ruling of the district judge, the district judge essentially said, if I'm correct, as I understand it, he said about each condition that you were complaining about, that none of the plaintiffs was regularly exposed to those conditions as opposed to being exposed to them for merely 24 hours, essentially adopting as a rule of law that if it lasts less than 24 hours and you're not regularly exposed to it, it's not a constitutional violation. And I'm not sure there's any foundation for that in the Constitution. The district judge seemed to be adopting an argument saying that if it wasn't for more than 24 hours, it's not a violation of the Constitution. So it doesn't matter how much feces there were around or how intolerable the conditions were. It was only 24 hours, and the Constitution doesn't cover that. Oh, I agree. And lest there be a mistake, this court in Willie rejected that argument. Willie seems to contradict that analysis. It contradicts every aspect of the district court's analysis, which was just wrong in every aspect. Now, you moved to reconsider based on Willie. Would you just give me a glance? Here's what happened. So the district court rendered its decision. I don't have the exact date, but pre-Willie. This court then rendered its decision in Willie in a timely fashion. We then moved. I wasn't involved yet, but plaintiff's counsel moved for reconsideration. But the day that it moved for reconsideration, he first filed a notice of appeal. Hours later, he then filed his motion papers for reconsideration. And then I have to get the docket sheet. But then in a docket entry, Judge Kuntz denies. In a docket entry, it says, I'm divested of subject matter jurisdiction, which is just wrong. It's absolutely wrong. And we then filed an amended notice of appeal. We didn't appeal. We didn't move for – actually, I think we even wrote a letter saying, you know, Judge, that's not correct. And he just said no. At 21 of the joint appendix. Why are you asking for a review of that error? Because we end up in the same place because Willie's the law that the court has to apply. I think he's – Should we vacate and remand for reconsideration in light of Willie? I think the – that's totally within your discretion, obviously. The question is, the record's here for you to examine. I think both sides – the evidence is before the court, so it's sufficient. I don't know if – so that's within the discretion. That's obviously the court's call. I'm not sure I – There is no ruling by the district court based – that has the benefit of the analysis in Willie. Is that correct? Yes. Yeah, that's absolutely – the court – we gave the court the opportunity. I just want to be clear. Plaintiff, appellant gave Judge Kuntz the opportunity to consider Willie, and the district court said no. So – but the answer to your question is that is correct. Judge Kuntz stood by his ruling. Could I ask you, of course, a more granular question? Of course. With respect to the personal involvement of the three defendants, the defendants say that that's an issue that was not raised below and is waived. That can't be right with respect to Pinheiro because that was one issue that the district court identified, personal involvement of Pinheiro. But what about the personal involvement of the other two defendants? Are you asking me whether he considered her or is that something that should be remanded or something else? No, whether it was a matter that was raised by the defendant. I don't – we obviously wrote in our brief that it was not addressed. I don't remember seeing it. I believe you misspoke, Judge Kuntz. You said the defendants – in our brief, we indicate that that was not raised. The court can still – obviously, the court can affirm on any record – on any basis found in the record. What was the evidence of the personal involvement by Pinheiro? He had overall responsibility. I'm prepared to say that that limited aspect of the district court ruling should be affirmed. I think it's relevant to claims of Manel liability. I would also like to bring to the court's attention that with respect to Kovatic, his liability only can relate to Glenn, plaintiff appellant Glenn, because he left in, I believe – he left after Glenn's release from custody, but before everybody else, and Tobin came, and then Tobin came through. And Captain Tobin was in charge of the – Throughout the remainder of the detentions of the rest of the country. Would you address qualified immunity with respect to the other? Sure. Again, this is something that we believe the court should remand to Judge Kuntz if the court agrees that one or more of the individual plaintiffs – and we think they all have – state a claim or have created sufficient factual disputes to go forward. Both Kovatic and Tobin testified at their deposition, and Tobin submitted an affidavit that says, I'm there every day. Not only am I there every day, but I specifically toured the condition, reviewed the conditions of the cells. That means – and it's a supervisory liability claim, obviously. That means he knew what was going on, or at least that's a reasonable inference. He's also – in his declaration, he identifies log records about efforts to clean the cells. Well, certainly there's a factual dispute as to whether they were cleaned at all. Well, I think that the argument that I'd like you to address in the context of qualified immunity is that really had not been decided before all the events in 2013 and that at least the Correctional Association of New York County – is that the right name? Yes – had in the course of two tours indicated that the mail facility was okay. One moment, Your Honor. I think those are two separate arguments of the qualified immunity. That's correct. Well, he gets to the issue of – I'm putting them all together for you. One full basket. Just let me get to the correctional officers of New York. Those findings, assuming they're not hearsay, predate anybody's stay. Let me just make sure that's correct. 2010. Right. Nobody's there at 2010. Or the letter – we indicate that the first plaintiff, Glenn – and this was undisputed – the first plaintiff was there July 10, 2011. So obviously what those conditions were 5, 9, 11 months earlier sheds no light as to whether they were in compliance. So that's – it's a red herring as far as I'm concerned as far as whether – it's just not relevant. It would never come to light about what the conditions were five months before anybody's there. Then would you turn to the Willie issue? Which you rely on extensively. Of course. But in Willie itself, this court references its decision in 2001 in Gaston and its decision in 1974 in LaRoe talking about having people live in fetid, waste-filled conditions, albeit for longer periods of time. That's what I'm focused on. That's what I'd like you to focus on. But I don't think that it would be ironic to be understating that somebody's compliance with a state law requirement that somebody be released from 24 hours where the conditions are otherwise unconstitutional should redound to their benefit. And I don't think while Willie obviously articulates more fully principles governing this case – and again, we're talking about just human excrement. Each plaintiff also talks about other conditions. But I don't think that before Willie's announcement that there's never been a durational requirement means that the fact that there's never been a durational requirement gives them qualified immunity. The conditions themselves – The issue, and I'm very receptive, but there's an analytical problem for me that I'm trying to grapple with, which is that Willie itself seems to acknowledge that it was slightly unclear. And to the extent that it's unclear, we're going to say that there was no durational requirement. I don't read it that way, Joe. If you want to point me to where in the opinion – obviously the court's going to draw its own conclusions. But I think it's significant that this case is not just about Willie. And what I mean by that is it's not just about human excrement. Plaintiffs – each of the individual plaintiff appellants also talked about rats and vermin and flies and mice and water bugs and cockroaches and eating food that is just not fit for anyone's consumption unless there be a mistake. Because some of the plaintiffs said they got cereal out of boxes. I don't care if the food's coming from the Gotham Bar and Grill, Del Posto, Lutece, which is no longer around. I don't care where it's coming from. You can't eat that food when you're surrounded by excrement, when the conditions are that horrific. So if this were just a case of an individual plaintiff being left to sit or stand in human waste for – There's another argument just before you sit on this mic. All these have further questions. You do. So my question, and then we'll get to just LaValle's question, is that your adversary makes an argument relating to the lack of a showing of any serious damage to health. Would you address that briefly? Well, Willie addresses that one and says there is no such requirement. The second is just factually wrong, and let me just explain why. In their interrogatory responses, which begin at 1665 and go through 1682 – and we're talking about interrogatory number three, or the responses – 1665, I may have misspoken, through 1682. Each individual plaintiff appellant complained of overcrowding, sleep deprivation, unusable toilets, and lack of toiletries. Further on, they talk about the injuries, mental distress. The fact that they may not have had physical injuries, that's a PLRA requirement, but they each testify to how it was effective, and you can find – I apologize, I don't have the deposition sites here ready, but I am representing, and each plaintiff in their respective depositions testified to the harm they had. Nobody – I don't think anybody had permanent psychological harm. Nobody was complaining necessarily about physical injuries. But it was, in effect, the trauma. Yeah, they were emotionally – understandably. Nobody's life was ruined, but as the court said in Willie, that goes to damages to be awarded. And I understand, Judge LaValle, you have a question. There's one last point I want to make. I wanted to ask a question about qualified immunity because while I understand that this court can affirm for any reason, even if it disagrees with the reason given by the trial judge, unless we take that route and search the record and find our own reasons why the officers should be entitled to qualified immunity, it seems to me that the treatment given by the district court, which was in one tiny paragraph, he said the defendants are entitled to qualified immunity because the evidence is clear that the defendants suffered no constitutional violation. That was wrong. The district court did not have a proper basis for ruling that there was no constitutional violation. No constitutional violation means that you don't have a claim, I guess, encompassed within that is that there's qualified immunity. But the district judge, if the district judge was wrong on that, why should we scour the record to see whether there is a basis that the district judge didn't rely on? Why don't we just fake it? We, as I mentioned to Judge Kodal, and as we note in our brief, that is the usual route that this court takes. That's how you started your argument is that we should send that back on qualified immunity. I don't think it was the first word out of my mouth, but yes. That is in response to Judge Kodal's question, absolutely. And building on Judge LaValle's point, Your Honor, I believe, wrote the opinion in Askins. The fact that we may not, and we think we, obviously with Pinero, there's not going to be a claim, but whether you agree or not that there are claims, either constitutional deprivation, the Acobitich, or Tobin could be held liable, or whether they're entitled to qualified immunity, there are officers there night and day, and they're watching what's going on. So if you agree that there is a constitutional deprivation while the officers won't, individual officers, police officers. You said in the course of your argument, if I understood you correctly, you said that you concede with respect to certain officers, or there were certain things to which you said you will not press them. Will you give us a letter telling us which ones you are taking out of the case so that we don't have to puzzle ourselves about that. We'll do that. The district court won't need to if we remand. It will be Pinero, and of course, absolutely. Exactly what you are taking out of the case voluntarily. Absolutely. We'll do it. Okay. I have two minutes for rebuttal. Thank you. Thank you. Ms. Park. I'll give you a little extra time as well. Okay, Mr. Carbell. May it please the court, Kathy Park for the city defendants. Your honors, the district court's judgment should be affirmed on several independent grounds. There hasn't been a showing of personal involvement. And in response to this honors question as to whether we had made these arguments below, we did move to dismiss the case on behalf of all the individual defendants on the ground of. . . So in light of Willie. . . Yes. I'm sorry. You finished that there. Oh. We did move to dismiss on the ground of personal involvement on behalf of all individual defendants, so that was. . . But it appeared from the district court decision that the only defendant who was. . . As to whom the argument of no personal involvement was being made was Pinheiro. So in our initial motion to dismiss the complaint, that's where we made our arguments. Then when we. . . That was denied by the district court. And then when we moved for summary judgment, your honor is correct, we only moved. . . We only renewed that argument as to Pinheiro. But the arguments as to whether there was a lack of personal involvement. . . You didn't raise it on the motion for summary judgment. We didn't, your honor. I'm sorry? We didn't. You did not. We did not. Except for Pinheiro. That's right, your honor. But that argument was before the district court, and we believe that as a matter of law, that there is still a lack of personal involvement showing as to the two remaining individual defendants in this case. You didn't raise it in your motion. And the district court is not permitted to grant your motion beyond. . . For reasons that you didn't argue, at least without giving notice to the other side, that the court has gone beyond what has been noticed in your motion. That's right, your honor. But we did make. . . This was briefed in the motion to dismiss. It was an argument that was already rejected. So you're telling us that, and I don't doubt that it's true. If the district court is not allowed to grant relief that wasn't sought or to grant relief on the grounds that wasn't argued without giving notice, which wasn't given, then what's the point of telling us that? I don't see that it plays any role in this proceeding. Okay, your honor. Then, your honor, I would like. . . If there's a question on Willie that your honor wanted. . . Well, there's a question on Willie. There's a question on qualified immunity. And I don't understand, although I gave Mr. Carbone some trouble, why we don't just send this all back. So why don't you start from there? Your honor, as your honors have already mentioned, this court may affirm on the grounds that the district court did not reach, and we don't think that there's a reason or need to remand for a number of reasons, but especially with respect to qualified immunity, where Willie, the case on which defendants so heavily rely on, postdates the conduct or the period of time at issue in this complaint, where there's no question that the individual defendants would not have been on notice of that decision. The proposition that there is no condition so heavy that it amounts to a constitutional violation if somebody is subjected to it for less than 24 hours, where does that come from? What is the ostensible validity of that proposition? Yes, Willie is a case that hadn't been decided yet at the time of its conduct, but if it states something that's so obvious that there was just nothing to the contrary, you don't need a case squarely on point to put officers on notice of something that's just so obvious that it scarcely needs to be said. Your honor is right that we don't need a decision exactly on point, but the existing president still has to put the issue beyond dispute, and here- You're asking us, aren't you, to establish as a principle of law that so long as you don't expose a pretrial detainee to heinous conditions, toilets that don't work, overflowing with feces and the like, rotten food, vermin, so long as you don't do that for more than 24 hours as a matter of constitutional law, there's no violation of due process. That's what you're asking us to say is the principle of law on the basis of which we could grant qualified immunity. Not quite as- We could recognize qualified immunity. Not quite, I don't think that's quite our argument as framed. We're saying- Why not? Because we're saying that, well, first, we're saying that it's an extremely high bar for a constitutional violation to arise to a constitutional violation, and here where the baseline is that all of the detainees were provided with food, water, toilets, there were times, yes, that the conditions broke down or where for intermittent periods of time- Just answer my question. In order to affirm, we would have to find, as a matter of law, that exposure to the conditions that I just described for no more than 24 hours is not a violation of due process as a matter of law. That's one of the grounds that this court could affirm, or this court could affirm on the grounds of qualified immunity, in which case the ground would be that that principle of law was not clear to individual defendants at the time of the conduct in question. It was not clear at the time that you cannot constitutionally expose people to the most heinous conditions so long as you don't do it for more than 24 hours. That was a matter that was sort of in dispute. Regularly. Regularly. That was a matter in dispute. Was there any case, any case that ever said that, so long as you don't expose a prisoner, an inmate, pretrial detainee, to the most heinous conditions for more than 24 hours, that is not a violation of due process? No, Your Honor, there was no case that said that, but there were a number of cases in the district court and other circuits that have granted summary judgment or held that the record did not amount to a constitutional violation in periods involving more egregious circumstances than the circumstances at issue here, and for longer periods of time than the period of time in question in this case. They must have involved other situations, other conditions, because none of them that you've brought to our attention has said that so long as you don't do it for more than 24 hours, anything goes. Right? There's just no case. But that would actually support our argument for qualified immunity in the sense that if there is no case that makes it clear, gives any kind of bright-line rule, and the only cases that plaintiffs have cited to you before Willie are cases that involve more egregious circumstances or for longer periods of time. It seems to me that you're giving up on your argument that you really were entitled to summary judgment as a matter of law on the grounds that there was no constitutional violation, and you're hanging your hat completely on these officers were entitled to qualified immunity because the law wasn't clear that you could not expose a prisoner to the most heinous conditions so long as you didn't do it for more than 24 hours. And it seems to me that that runs directly into the Supreme Court's decision in Hope against Peltzer. Why do you need a case directly on point to say, you can't do that? Your Honor, let me backtrack. I don't mean to concede our position that the conditions in this particular case did not amount to a constitutional violation. And I do want to point out a number of problems with the plaintiff's case. The first is, the biggest problem is that they're relying solely on anecdotal experiences of just a handful of plaintiffs. We're talking about... This is not a class action. That's right, Your Honor. By 20 pretrial detainees, so of course they have to rely on anecdotal evidence from these people. Right, but in order to succeed on a Section 1983 claim against supervisory officials or to proceed on a Monell claim, you still need to show that the problems were either so persuasive or so systemic to put these individual defendants or the city on notice. And we're talking about 20 individuals out of the tens of thousands. Stop, Your Honor. Sure. Why is that true? Why does a 1983 claim by an individual detainee against an individual officer who allegedly walked around every day, inspected the cells, depend upon any requirement of a systemic failure? An officer walks by, he sees that the cell is full of feces with a toilet that's overflowing and doesn't work. He doesn't have to ask himself, gee, is this going on in other cells or not, when he is sued by the person who is in that cell. Because these particular detainees have not raised their... They testified that they'd never raised their concerns to the supervisory officials. And so in order for... You need to show that this is not something that just intermittently happened. There were more than just intermittent deficiencies in running this facility during the period in question. There are a lot of challenges, and there are a lot of challenges in maintaining a facility like this where there are tens of thousands of individuals coming in and out. Can I ask you one record question? Yes, Your Honor. Were each of the 20 pretrial detainees in this case in a cell for a period of time with a toilet that didn't work? I mean, you point out that some were able to use it for urination, but the plaintiffs point out that the toilets didn't work and that they really couldn't be used for other functions. I'm left with the impression that with respect to all 20, they either had, for a period of time, no toilet or a toilet that couldn't be used other than in the most rudimentary way for urination. No, Your Honor. For example, if you look at page 212, Jones testifies that the toilet worked in his cell. If you look at... The plaintiffs say they worked in the sense that you could urinate but do nothing else because the toilets otherwise were not working. That's not what this particular detainee said, although I would have to... Okay. But in any event, what the plaintiffs are basically doing here is they're plucking experiences or the worst experiences from a handful of plaintiffs to try to paint this aggregate picture. And if you look at some of the testimony of some of the other detainees, there's Malofsky. Yes, he testified that the toilet was not working in that cell, but he also testified that it was largely the result of another detainee who had taken a toilet roll and stuffed it into the toilet to clog it. If you look at Ming's testimony on page 279, he said that in the holding cell outside the courtroom, if you needed to use the bathroom, a guard would escort you. So plaintiffs here haven't shown that... The problem with their case is that they're basically litigating in a generalized approach where they haven't shown... They're litigating with respect to these 20 people who are the plaintiffs in the case. Right, but they're plucking the worst experiences of each plaintiff. Yes, Your Honor, but each plaintiff in their experiences at this facility, they were not in one particular cell for the entire period. They were all there for different periods of time, and they testify that their experiences from each cell... Is there a fair inference that the toilet is not working in the way that you just total described for a couple of people, or at least some number of these plaintiffs, that that's the condition that it was in? I mean, we're talking about a period throughout 2013 that they're describing, right? Yes, Your Honor. And with respect to the toilets, with respect to the food and rats eating into the food, isn't it a fair inference that the rats don't go away the next day? They don't bother only the plaintiff, but they are there for the other people who are in the cell, too? No, Your Honor, not on the record here, because you have extensive testimony about cleaning records and the policies in place. So you might prevail. Somebody, some juror, may believe the logs and disbelieve the individual plaintiffs or other witnesses. Right, Your Honor. But we think even with the plaintiff's testimony of intermittent deficiencies, the Constitution leaves room for conditions to break down at times, for a toilet to break down and for the city not able to get a plumber within the short time period of time that the plaintiffs are in these facilities. We do have work orders showing that whenever there was a work order placed about a nonfunctioning toilet, that a work order, that a plumber would come within a day. This may not have been in the period of time. That's a great trial argument that you have available to you. Okay. On the Monell issue. Yes, Your Honor. The Monell issue. I don't, it seems to me that the district judge's reasoning is quite wrong, because, I mean, this is a facility that's being maintained by the city. Now, you have just been arguing now that at trial you may be able to show that when there were problems, they were taken care of. But to the extent that there's a case before the court, that there was this condition that the toilet's not functioning properly, the cell covered with feces, the toilet not even approachable, food covered with maggots, rats, so on and so forth, and the city's saying, well, that's not the city's policy or custom. The city is maintaining that facility. It's much more the city's problem than it is an individual officer who's assigned, hey, you take care of this, and there's not much more that he can do about it. Why is that not the city's policy or custom when the city is itself maintaining this facility in that condition? It's not that the city is being held responsible for one officer who popped somebody on the head. This is the city, the city's facility. It's not, Your Honor, because the city's policy is to maintain these facilities and to provide food. We put in extensive evidence in the record there. And then to the extent that you are trying to pursue a deliberate indifference theory, you'd have to show that not only that these circumstances were occurring, but that the city was deliberately indifferent to it, not taking any kind of action. And first, I don't think there was any notice here, because we do have the inspection reports from state agencies showing that the conditions were meeting state regulations. At minimum, those letters or those inspection reports would have indicated or reasonably indicated to any high-ranking official at NYPD that the conditions were at minimum meeting constitutional standards if they were deemed to be meeting the higher state standards. One of the issues in the case for a constitutional violation by the individual officers is the issue of where does subjective intent stand after the Supreme Court's decision in Kingsley. After the briefs, we got the decision from the Ninth Circuit in Castro, which says that on an inhumane conditions case, in that case it was excessive force or failure to protect, it shouldn't be a subjective standard anymore. It should be an objective standard. Why isn't that right? So that the standard here would be not whether the individual officers subjectively appreciated the danger of harm, but whether a reasonable officer in the circumstances would have considered this to be exposure to excessive force. That's not right for several reasons. First, a claim that is based on deliberate indifference versus excessive force are fundamentally different. You have in excessive force, you're already presuming an affirmative act, whereas in deliberate indifference, you're not. So if you were to take that reasoning under Castro... Can I just take one step back? Sure. The Eighth Amendment is about punishment. The process clause is not. Kingsley seems perfectly reasonable to say that when you're dealing with the Eighth Amendment, you look at a subjective intent to punish, but when you're looking at the due process clause, you don't. You look at an objective standard. Why isn't that analysis, as the Ninth Circuit just did, perfectly reasonable, so that Kingsley is not limited to excessive force? Well, first, I don't think that... If you look at Castro, that decision didn't completely get rid of a state-of-mind requirement. And then second, the reason why it doesn't... Basically, you would be reducing a standard of constitutional liability to a standard of negligence if you were to completely eliminate any kind of state-of-mind requirement. An intentional act can't be negligent. It has to be an intentional act by the officer who recognizes a condition and does nothing about it. That's intentional. Right. And the issue is whether the officer has to subjectively appreciate that he's subjecting the prisoner to excessive harm or whether it's simply that a reasonable officer, under the circumstances, would appreciate that he is subjecting a prisoner to the risk of excessive harm. Why isn't that a perfectly reasonable standard, consistent with Kingsley, consistent with Castro, and which doesn't ask whether this is an Eighth Amendment violation but only a due process violation? It's not because even Kingsley recognized that you'd really... Even Kingsley expressed some concern about opening the floodgates of litigation here. And in Kingsley, the court resolved that concern with the PLRA, which wouldn't necessarily apply to claims brought by pretrial detainees. So that concern is still present in the analysis for pretrial detainees. And the reason why that analysis, that test that the Ninth Circuit adopted, it would widen the gates of liability and essentially reduce it to this negligent standard. Now, if you were to apply it, if Your Honor were to even accept the Castro standard, we don't think that there was any evidence here showing that the supervisory individual, defendants in this case, intentionally imposed any conditions by design. And in any event, we think that qualified immunity would resolve the claims because Castro is a decision that was decided well after the conduct at issue here. But the reason why we think, the reason why Castro should not be adopted is because these claims are fundamentally different, because you're talking about an affirmative act, and because you would then be altering the test for constitutional liability for claims premised on deliberate indifference that would raise concerns that wouldn't be the same concerns under the Eighth Amendment. Ms. Park, I've kept you well past your time. Thank you. Mr. Cuomo. I think you kept her even past my time, which I appreciate. First question I have for the panel is when is the letter due, Judge LaValle, that you'd recommend? Can you get it in by close of business today? Would that be possible? Yes. Great. A few quick points. I think it's significant to the Castro issue, which I'm not getting up to address, is that, again, we're not talking about pretrial detainees. We're talking about pre-arraignment people, pre-arraignment individuals. So there hasn't even been a probable cause determination. But there's still a due process. Yes, absolutely, Judge. But to the extent we're talking about process, these individuals haven't had any yet. I'm not sure what you're saying. Do you want us to adopt an analysis like the Ninth Circuit did in Castro? Absolutely, yes. But I just draw the distinction that we are talking about pre-arraignment individuals, not pretrial individuals. I may have mentioned this, but the individuals were kept in multiple cells, and each individual described each cell virtually identically. So if you take a look at Vicky's testimony, if you take a look at Tucker's testimony, Gordon's testimony, each cell they find themselves in is just heinous. And the last point I want to make, subject to any questions, is this is not anecdotal evidence. This is direct evidence. When Tucker testifies about the conditions he's in, that's not anecdotal. That is absolutely admissible. This is what they experienced at the time that they were there. And unless the panel has any questions, thank you. Thank you very much. We'll argue on both sides. We'll reserve decision.